[No. C001868. Third Dist. Jan. 18, 1990.]

CATHY A. PERSONS, Plaintiff and Appellant, v.
SALOMON NORTH AMERICA, INC., Defendant and Respondent.

**[Opinion certified for partial publication.*]**

---

* Pursuant to rule 976.1 of the California Rules of Court, the Reporter of Decisions is directed to publish all portions of this opinion *except* parts II, III and IV.

COUNSEL

Robert Mann and Linda Anisman for Plaintiff and Appellant.

William C. McKinley and Bullen, McKinley, Gay, Keitges & Pach for Defendant and Repondent.

OPINION

**SCOTLAND, J.**—Plaintiff brought this action to recover damages for personal injuries sustained in a skiing accident. Before trial, plaintiff entered into a sliding scale settlement agreement with The Cornice Ski and Sport, Inc. (Cornice), where she rented skis equipped with Salomon 444 ski

bindings; settled with United Merchandising, doing business as Big 5 Sporting Goods, where she purchased her ski boots; dismissed her action against defendant Mammoth Mountain Ski Area, Inc., where she skied on the date of her accident, and dismissed her action against defendant Edison Brothers Stores, Inc., the successor in interest to United Sporting Goods, where she previously had purchased skis and ski bindings. The case was tried before a jury against the only remaining defendant, Salomon North America, Inc. (Salomon), the distributor and wholly owned subsidiary of the manufacturer of the bindings which Cornice affixed to the rental skis.

At trial, uncontradicted evidence established that the Salomon 444 bindings were incompatible with plaintiff's untreated thermoplastic boots. Thus, when plaintiff fell while skiing, the bindings did not release and her left knee was injured. Salomon was aware of the conflict between its bindings and thermoplastic boots. Although Salomon did not warn plaintiff that the bindings should not be used with her ski boots unless the boots were lubricated, evidence was presented from which the jury could find that Salomon had warned Cornice about the incompatibility and had given Cornice instructions on how to recognize and treat thermoplastic boots to avoid the problem.

The trial court denied plaintiff's motion for partial directed verdict, and the jury returned special verdicts in Salomon's favor.

Although not clearly delineating her primary claim of error, plaintiff appears to contend that the trial court erred in denying her motion for a partial directed verdict. Plaintiff argues that Salomon is strictly liable as a matter of law because it had a duty to warn plaintiff, the ultimate user of the bindings, about the aforesaid danger and failed to do so. We disagree.

In the published portion of this opinion, we hold that Salomon discharged its duty to warn by alerting Cornice to the danger posed by pairing Salomon 444 bindings with untreated thermoplastic ski boots. The evidence is sufficient to establish that Salomon had no feasible means of providing a warning directly to one who rents Salomon bindings from a ski shop. Moreover, a warning to the ultimate user would have been ineffectual because the ordinary user of rental skis and bindings lacks the expertise necessary to understand and apply the requisite warning and, instead, relies on the ski shop technician to provide appropriate equipment with proper safety adjustments. Under the circumstances, Salomon reasonably could rely on the rental shop to notify the ultimate user of the danger and to take steps

necessary to avoid the potential harm by properly treating the thermoplastic boots or refusing to rent the bindings to a skier who owns such a boot.[1]

## FACTS

On January 30, 1981, plaintiff was injured while skiing with her husband and two sons at Mammoth Mountain. At the time of the accident, she was wearing her own Formula ski boots and using rented Olin 180 skis with Salomon 444 bindings. Plaintiff had her own 160 centimeter skis but thought it was time "to move up" to 180 centimeters. Thus, she decided to try demonstration skis of the longer length. She rented the skis and bindings from Cornice, where adjustments were made to the bindings based on her height, weight and skiing ability.

Although plaintiff felt uncomfortable skiing in powder and generally avoided it, she followed her husband and son onto an ungroomed transition trail leading from one ski run to another. The trail was "knee high deep" in powder. Plaintiff had difficulty staying in the tracks made by her husband. As she tried to stop she went into the deep powder and fell, injuring her left knee when the ski bindings did not release.

Plaintiff was in a cast for six weeks. When the cast was removed she went to physical therapy, which proved unsuccessful. After two arthroscopic operations and a total of 70 physical therapy sessions, plaintiff still had a 40 percent weakness in her left leg and did not have the full range of movement in her knee. Her medical bills totaled $10,793.

At trial, plaintiff's expert testified that Salomon 444 bindings do not release at safe levels with untreated thermoplastic boots due to the boots' high coefficient of friction in the unlubricated state. Thus, the expert opined there is a defect in the design of the binding because it is reasonably forseeable that thermoplastic boots would be used with Salomon 444 bindings. He further opined that the boot was not defective and concluded that Salomon was at fault for failing to provide an adequate warning.

Defendant's expert testified that the Salomon 444 bindings were not defectively designed. He attributed the incompatibility to the defective frictional characteristics of the boot and opined that plaintiff's boots were defective because they were untreated and had a nonstandard boot sole. Defendant also introduced evidence from which the jury could conclude that Salomon had warned Cornice about the incompatibility problem and

---

[1] We do not express an opinion regarding the scope of Salomon's duty to warn for ski bindings sold directly to the ultimate user.

had informed Cornice how to identify thermoplastic boots and treat them so they safely could be used with the Salomon bindings. Defendant's expert testified that a warning to the ultimate consumer would not have been helpful, because a typical user has insufficient knowledge and expertise to recognize thermoplastic boots and benefit from the warning and, instead, relies on the ski shop technician to provide appropriate bindings with correct settings based upon the skier's size and ability.

### DISCUSSION

### I

The uncontroverted evidence showed that use of Salomon 444 bindings with thermoplastic boots which have not been treated with silicone poses a significant danger of physical injury to the skier. Uncontested evidence also established that plaintiff was not informed of this danger when she rented from Cornice demonstration skis with Salomon 444 bindings for use with her thermoplastic boots. However, evidence was presented from which the jury could find that, by way of technical manuals and certification courses for ski shop technicians, Salomon warned Cornice of the danger and instructed Cornice how to recognize and treat thermoplastic boots to prevent harm to the skier.

Prior to the case being submitted to the jury, plaintiff moved for a partial directed verdict. As one ground for the motion, plaintiff argued, "At no time did defendant (or anyone else) provide any warning to plaintiff that defendant's bindings would not function with thermoplastic boots." The motion was denied.

"A directed verdict may be granted against a [defendant] '. . . "only when, disregarding conflicting evidence and giving to [defendant's] evidence all the value to which it is legally entitled, . . . indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the [defendant] if such a verdict were given." [Citations.] *Unless it can be said as a matter of law . . . no other reasonable conclusion is legally deducible from the evidence . . . the trial court is not justified in taking the case from the jury.*' [Citations.] [¶] The function of a trial court in ruling on a motion for a directed verdict is analogous to that of a reviewing court in determining on appeal whether there is evidence in the record of sufficient substance to support the verdict or judgment. *In considering the motion, the trial court may not weigh or consider conflicting evidence or judge the credibility of witness.* [Citations.]" (*Hilliard* v. *A. H.*

*Robins Co.* (1983) 148 Cal.App.3d 374, 395 [196 Cal.Rptr. 117]; italics in original.)

In determining the propriety of the trial court's ruling, we must consider the scope of Salomon's duty to warn of the danger posed by the incompatibility between its 444 bindings and untreated thermoplastic boots. On appeal, as she did in the trial court, plaintiff contends that Salomon had a duty, as a matter of law, to directly inform plaintiff, the ultimate user. Salomon retorts that its duty was fulfilled by the warning it gave Cornice. Salomon argues that it is impossible to directly warn those who rent bindings distributed by Salomon, thus defendant was entitled to rely on Cornice to pass Salomon's warning on to individuals to whom the ski shop rented skis equipped with Salomon 444 bindings.

A manufacturer, distributor or wholesale or retail dealer is strictly liable in tort when an article he or she places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; *Canifax* v. *Hercules Powder Co.* (1965) 237 Cal.App.2d 44, 52 [46 Cal.Rptr. 552]; Rest.2d Torts, § 402A, com. f, p. 350.)

The strict liability concept of defectiveness applies to products which are dangerous because they lack adequate warnings or instructions. (*Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 427-428 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].) "[A] manufacturer or a supplier of a product is required to give warnings of any dangerous propensities in the product, or in its use, of which he knows, or should know, and which the user of the product would not ordinarily discover." (*Groll* v. *Shell Oil Co.* (1983) 148 Cal.App.3d 444, 448 [196 Cal.Rptr. 52].) Even though the product is flawlessly designed and manufactured, it may be found defective within the general strict liability rule and its manufacturer or supplier held strictly liable because of the failure to provide an adequate warning. (*Finn* v. *G. D. Searle & Co.* (1984) 35 Cal.3d 691, 699 [200 Cal.Rptr. 870, 677 P.2d 1147]; *Groll* v. *Shell Oil Co., supra,* at p. 448; *Cavers* v. *Cushman Motor Sales, Inc.* (1979) 95 Cal.App.3d 338, 347 [157 Cal.Rptr. 142].)

Strict liability generally focuses on the product to determine whether it is defective rather than on the actions of its manufacturer. This concept is readily applied in design or manufacturing cases where the defect is inherent in the product. However, in failure to warn cases where the product is both flawlessly designed and manufactured, the defect is not inherent in the product; rather, the product is rendered defective because of the actions of

the manufacturer in failing to adequately warn of the dangerous propensities of its product.

As we observed in *Oakes* v. *E.I. Du Pont de Nemours & Co., Inc.* (1969) 272 Cal.App.2d 645 [77 Cal.Rptr. 709], "A rule imposing an obligation upon a manufacturer (or seller) to give a suitable warning and a rule conditioning liability upon the fact of knowledge or reason to acquire knowledge are rules fixing duties of care. Since violation of a duty of care has always been an element in the definition of negligence, the rules expressed in comment j [duty to warn] of the new Restatement [Second of Torts], although stated as an adjunct to 'strict' liability are merely well settled rules already a part of the law of negligence." (*Id.*, at p. 650, fn. 4.) Dean Prosser similarly noted this melding of legal theories, stating, "[in failure to warn cases], the liability of the manufacturer, even though it may occasionally be called strict, appears to rest primarily upon a departure from proper standards of care, so that the tort is essentially a matter of negligence." (Prosser, Law of Torts (4th ed. 1971) pp. 644, 646.)

■ Thus, courts have recognized that the test for failure to warn under strict liability contains a standard of reasonableness. (*Lee* v. *Electric Motor Division* (1985) 169 Cal.App.3d 375, 387-388 [215 Cal.Rptr. 195].) Factors such as "the normal expectations of the consumer as to how the product will perform, degrees of simplicity or complication in the operation or use of the product, the nature and magnitude of the danger to which the user is exposed, the likelihood of injury, and the *feasibility and beneficial effect of including a warning*" must be considered to determine whether a warning is necessary. (*Cavers* v. *Cushman Motor Sales, Inc., supra*, 95 Cal.App.3d at p. 348 (italics added); 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 1266, p. 708.)

Another circumstance which should be considered is the reliability of a third party, e.g., a business intermediary, to convey the warning to the ultimate user. This factor is contained in comment n to section 388 of the Restatement Second of Torts. Although comment n relates to a product liability cause of action for negligent failure to warn where the manufacturer alerted only the intermediate distributors, we conclude that its factors also should apply to failure to warn under strict liability. *Cavers* and *Oakes* make it clear that the touchstone of liability under a strict liability cause of action for failure to warn is *reasonableness* and relied on concepts common to those found in negligence. "As other decisions and commentators have noted, [strict] 'liability based upon a failure to warn adequately of dangers [(Rest.2d Torts (1965) § 402A, com. j, p. 353)] is itself a doctrine borrowed from negligence. [Citation.]' (*Woodill* v. *Parke Davis & Co.* (1986) 79 Ill.2d 26 [402 N.E.2d 194, 198]; *Carmichael* v. *Reitz* (1971) 17 Cal.App.3d 958,

988 [95 Cal.Rptr. 381]; *Oakes* v. *E.I. Du Pont de Nemours & Co., Inc., supra,* 272 Cal.App.2d at p. 650, fn. 4.)" (*Vermeulen* v. *Superior Court* (1988) 204 Cal.App.3d 1192, 1204 [251 Cal.Rptr. 805].)

■ With these general principles in mind, we first look to the feasibility of Salomon providing an effective warning directly to the ultimate consumer. Although there are few instances in today's marketplace where a product is delivered directly to the consumer from the factory which manufactured it, "[m]any . . . articles can be made to carry their own message to the understanding of those who are likely to use them by the form in which they are put out, by the container in which they are supplied or by a label or other device, indicating with a substantial sufficiency their dangerous character." (Rest.2d Torts, § 388, comment n, p. 310.) On the other hand, courts have recognized that the manufacturers and distributors of certain products may have no effective way to convey product warnings to the ultimate consumer. (See, e.g., *Groll* v. *Shell Oil Co., supra,* 148 Cal.App.3d at p. 449; *Stevens* v. *Cessna Aircraft Co.* (1981) 115 Cal.App.3d 431, 433-434 [170 Cal.Rptr. 925].)

Considering the evidence adduced at trial, we perceive no practical method in which Salomon can provide an effective warning directly to the consumer who rents Salomon bindings from a ski shop. Plaintiff does not suggest that Salomon should have put a warning on or in the product container. Such a warning would be ineffective because the renter doesn't see the product container. The ski shop removes the bindings from their containers and affixes the bindings to skis which the shop rents to its customers. Rather, plaintiff argues that Salomon could have put a decal on its bindings stating, "Warning: Do not use with incompatible thermal plastic [*sic*] boots."

Plaintiff's suggestion ignores the testimony of her own expert. The thrust of that evidence is that Salomon failed to sufficiently warn *Cornice* of the danger because defendant's technical manuals did not contain adequate instructions on how to identify thermoplastic boots. The expert never asserted that Salomon should have notified plaintiff of the danger. To the contrary, it is clear from her expert's testimony that a statement affixed to the bindings simply warning plaintiff not to use them with incompatible thermoplastic ski boots would have been wholly ineffectual. Plaintiff's expert acknowledged that consumers would have difficulty distinguishing a thermoplastic boot from a hard plastic boot. In fact, the expert testified that even he "would have trouble walking into a ski store and arbitrarily seeing which boots are [thermoplastic] and which were not." Accordingly, a sufficient warning necessarily must include detailed instructions on how to identify thermoplastic boots. Since it took pages of trial transcript to set

forth the methods of identifying thermoplastic boots, it takes little imagination to recognize that putting such an extensive warning directly on the minimal surface of the binding is not feasible.

The evidence establishes another reason why a warning on the binding is unworkable—it would have no beneficial effect for consumers who have no technical expertise. (*Cavers* v. *Cushman Motor Sales, Inc., supra*, at p. 348.) According to plaintiff's expert, in order to identify a thermoplastic boot he would perform a "calibrated release check," a technical test requiring the use of a special measuring device. In the expert's view, using a fingernail test to determine the softness of the boot material and checking to see if the boot is stamped with a DIN marking (an industry standard relating to the characteristics of the boot) are not necessarily conclusive tests for identifying a thermoplastic boot. This evidence supports the opinion of defendant's expert who testified that a warning to the ultimate consumer would not have been helpful, because a typical user has insufficient knowledge and expertise to recognize thermoplastic boots and benefit from the warning. In fact, plaintiff's husband acknowledged that he and plaintiff did not know her boots were thermoplastic and relied on Cornice to provide appropriate equipment with proper safety adjustments.

In this respect, we see a parallel between this case and *Stevens* v. *Cessna Aircraft Company, supra,* 115 Cal.App.3d 431, a wrongful death action arising out of an airplane crash. In *Stevens,* the plaintiff claimed that Cessna was strictly liable because it failed to warn passengers about the load capacity of the plane it manufactured. Summary judgment was granted in favor of Cessna. Affirming, the appellate court noted: "The simple warning notice for the passenger compartment suggested by plaintiff would not be effective. Whether the plane can fly safely with a given total weight of passengers depends upon too many additional factors for a passenger to make an informed and intelligent judgment from such a notice . . . [T]he passenger necessarily depends upon the skill and judgment of the pilot to determine the load capacity of the airplane in light of the flying conditions to be encountered. Plaintiff's argument implies logically that numerous other bits of information should be posted in the passenger compartment to enable the passengers to second-guess the pilot on a myriad of flying decisions. It would be impossible ultimately to provide meaningful information to the passenger, and in the long run a rule requiring the manufacturer to provide such information directly to the passenger would not be in the interests of passenger safety." (*Id.,* at pp. 433-434.)

Similarly, the evidence in this case sufficiently established that a direct warning to plaintiff would have been ineffective, and thus unnecessary, because of the ultimate user's lack of ability to make an informed judgment

from such notice and the fact that the skier necessarily relies on the knowledge and technical expertise of the ski shop in selecting rental skis and bindings and making proper adjustments to set the bindings at an appropriate release level based on the skier's height, weight and skiing ability.

When a manufacturer or distributor has no effective way to convey a product warning to the ultimate consumer, the manufacturer should be permitted to rely on downstream suppliers to provide the warning. "Modern life would be intolerable unless one were permitted to rely to a certain extent on others doing what they normally do, particularly if it is their duty to do so." (Rest.2d Torts, § 388, com. n, p. 308.)

Here, Cornice was in the business of renting skis and bindings. It had an independent duty to exercise reasonable care in supplying this equipment and was itself subject to strict liability for failure to warn its customers of the dangerous propensities of articles it rented. (Cf. *Cavers* v. *Cushman Motor Sales, Inc., supra*, 95 Cal.App.3d at p. 340.)

The evidence establishes that Salomon 444 bindings do not pose a danger unless used with nonstandard or untreated thermoplastic boots. Once it has distributed its bindings to rental shops such as Cornice, Salomon has no practical way, other than warning and educating the rental shops of the danger, to control its product to see that the bindings are not used with untreated thermoplastic boots. Moreover, issuance of an effective warning depends upon proper identification of the skier's boot. Salomon cannot be expected to know the identity of the ultimate user of its rental bindings much less the type of boot the consumer is using. However, the ski shop technician has direct contact with each customer and has the ability, applying Salomon's technical manual and seminar training, to identify a customer's boot, assess its compatibility with Salomon bindings, lubricate the boot if necessary and set a safe release level.

Having provided a warning to Salomon dealers, defendant had a reasonable basis to believe Cornice would pass along the product warning and was justified in relying upon Cornice to perform its independent duty to warn as required by law. (Cf. *Brown* v. *Superior Court* (1988) 44 Cal.3d 1049, 1061-1062 [245 Cal.Rptr. 412, 751 P.2d 470] [The manufacturer of a prescription drug cannot be held liable if it has provided physicians with appropriate warnings regarding the drug's propensities and the doctor fails in his duty to transmit these warnings to the patient].)

In sum, we find that the evidence is sufficient to establish that Salomon did not have a duty, as a matter of law, to warn plaintiff. As discussed in the unpublished portion of this opinion, the evidence is sufficient to support a

finding that Salomon discharged its duty to warn by alerting Cornice to the danger posed by pairing Salomon 444 bindings with untreated thermoplastic ski boots and instructing Cornice how to identify thermoplastic boots. Accordingly, the trial court did not err in denying plaintiff's motion for a partial directed verdict.

II-IV*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

### DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Marler, J., concurred.

---

* See footnote, *ante,* page 168.