Filed 1/5/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re FUEL INDUSTRY CLIMATE CASES | |
| COUNTY OF SAN MATEO et al., Plaintiffs and Appellants, v. CITGO PETROLEUM CORPORATION, Defendant and Respondent. | A172719 (San Francisco City & County Super. Ct. No. CJC-24-005310, JCCP No. 5310) |

Plaintiffs[1] challenge the trial court's order granting a motion to quash service of the summons on defendant Citgo Petroleum Corporation (Citgo) for lack of personal jurisdiction.

We shall reverse. Specific personal jurisdiction over Citgo exists as plaintiffs' claims arose out of or related to Citgo's contacts with California—namely, its purchase, distribution, and sale of gasoline in California—and Citgo fails to show that the exercise of personal jurisdiction over it would be unreasonable.

---

[1] Plaintiffs on appeal are the San Mateo County Flood and Sea Level Rise Resiliency District along with the Cities of Imperial Beach, Richmond, and Santa Cruz and the Counties of San Mateo, Marin, and Santa Cruz, individually and on behalf of the People of the State of California.

1

From the 1980's to the mid-2000's, Citgo was one of numerous entities participating in the purchase, distribution, and sale of fossil fuel products in California. Plaintiffs contend Citgo and other defendants[2]—identified as "vertically integrated extractors, producers, refiners, manufacturers, distributors, promoters, marketers, and sellers of fossil fuel products"—were aware of the impact of those fossil fuels on Earth's climate. Plaintiffs assert that, rather than warning consumers of these dangers, defendants have "mounted disinformation campaigns" to protect their investments by undermining scientific data on climate change, creating doubt about the consequences of burning fossil fuels, and delaying transitions away from using fossil fuels.

Plaintiffs filed identical complaints against all defendants alleging seven causes of action: (1) public nuisance on behalf of the People of the State of California; (2) public nuisance on behalf of the plaintiff; (3) strict liability – failure to warn; (4) private nuisance; (5) negligence; (6) negligence – failure to warn; and (7) trespass. The complaint alleges greenhouse gas pollution from

---

[2] The defendants as named in the complaint are Chevron Corporation; Chevron U.S.A. Inc.; Exxon Mobil Corporation; ExxonMobil Oil Corporation; BP P.L.C.; BP America, Inc.; Shell PLC; Shell USA, Inc.; Shell Oil Products Company LLC; Citgo Petroleum Corporation; ConocoPhillips; ConocoPhillips Company; Phillips 66; Phillips 66 Company; Total E&P USA Inc.; Total Specialties USA Inc.; Eni S.p.A.; Eni Oil & Gas Inc.; Anadarko Petroleum Corporation; Occidental Petroleum Corporation; Occidental Chemical Corporation; Repsol S.A.; Repsol Energy North America Corporation; Repsol Trading USA Corporation; Marathon Oil Company; Marathon Oil Corporation; Marathon Petroleum Corporation; Hess Corporation; Devon Energy Corporation; Devon Energy Production Company, L.P.; Encana Corporation; and Apache Corporation.

use of defendants' fossil fuel products has had significant "damaging consequences" to Earth's climate, particularly in California.

The complaint contains the following allegations. Citgo engages in "substantial fossil fuel product-related business in California, and a substantial portion of its fossil fuel products are extracted, refined, transported, traded, distributed, marketed, and/or sold in California." The complaint asserts jurisdiction in California is appropriate because plaintiffs' injuries arose out of and related to defendants' operations in California, and each defendant—including Citgo—purposefully availed itself of the California market.

> "Through their various agreements with dealers, franchises, or otherwise, the Defendants direct and control the branding, marketing, sales, promotions, image development, signage, and advertising of their branded fossil fuel products at their respectively branded gas stations in California, including point-of-sale advertising and marketing. . . .

> "Defendants, in coordination with API[3] and other organizations, conspired to conceal and misrepresent the known dangers of burning fossil fuels, to knowingly withhold material information regarding the consequences of using fossil fuel products, to spread knowingly false and misleading information to the public regarding the weight of climate science research, and to promote their fossil fuel products which they knew were harmful. . . ."

Further, defendants, including Citgo, were aware of the real and significant threat posed by global warming, and "sought to minimize the [associated] risks and harms," such as by failing to issue "reasonable

---

[3] The complaint alleges the American Petroleum Institute (API) "is a national trade association representing the oil and gas industry" and has been involved in promoting disinformation about the climate impacts of fossil fuel products. It asserts Citgo "and/or [its] predecessor[ ] in interest are and/or have been API members at times relevant to this litigation."

warnings to consumers and the public" of the known dangers. Defendants, jointly and through industry groups such as API, engaged in a pattern of "direct misrepresentations and material omissions to consumers" regarding the risks of fossil fuels.

Defendants, jointly,[4] moved to quash the summonses and dismiss the State of California's first amended complaint and the local governments'[5] operative complaints for lack of personal jurisdiction. Citgo joined the defendants' motion and brought its own motion to quash the summonses and dismiss the complaints. Citgo asserted plaintiffs failed to demonstrate that its California contacts were substantially connected to the alleged claims and injuries, it lacked sufficient notice that its California activities would subject it to personal jurisdiction, and California's exercise of personal jurisdiction over Citgo would be unfair and unreasonable. Citgo argued its limited fossil fuel-related activities in California—i.e., acting as a "middleman between three gasoline retailers and other refiners that operated in California"—had no meaningful nexus to plaintiffs' claims, and its only marketing activities in California involved providing "limited Point of Purchase branding material at the 7-Eleven and Jack in the Box retail stations."

Plaintiffs opposed all motions to quash and dismiss on the basis that the Supreme Court's decision in *Ford Motor Co. v. Montana Eighth Judicial District Court* (2021) 592 U.S. 351 (*Ford Motor*) clarified that specific jurisdiction exists in any state in which defendants "systematically—and

---

[4] Chevron Corporation and Chevron U.S.A. Inc. were not parties to the joint motion to quash.

[5] These local governments are the City and County of San Francisco; the Cities of Oakland, Imperial Beach, Richmond, and Santa Cruz; the Counties of San Mateo, Marin, and Santa Cruz; and the San Mateo County Flood and Sea Level Rise Resiliency District.

4

deceptively—marketed and sold their fossil fuel products." Plaintiffs argued the climate-related harms at issue "are closely tied to Defendants' extensive, multi-faceted fossil fuel businesses and their deceptive (and highly successful) promotion and marketing of fossil fuels in California." Specific to Citgo, plaintiffs noted it "supplied fossil fuel products to hundreds of CITGO-branded gas stations [at certain Sears, 7-Eleven, and Jack in the Box locations] in California where it sold and marketed those products to California consumers," and plaintiffs' claims relate directly to those contacts. Citgo "concealed its knowledge and failed to warn consumers about the dangers of fossil fuel products while supplying, selling, and marketing those products in California."

The trial court granted Citgo's individual motion to quash. It concluded Citgo was not subject to specific jurisdiction because plaintiffs' claims did not arise out of or relate to Citgo's contacts with California. The court acknowledged that plaintiffs had provided evidence that Citgo (1) "was engaged in the purchase and sale of gasoline in California" via purchase agreements, services agreements, transportation agreements, and lease agreements, (2) agreed to make funds available for marketing in California, and (3) reserved rights regarding branding associated with fossil fuel products distributed under Citgo's brands and trade names. However, the court stated that none of this evidence demonstrated Citgo marketed its products in California or directed marketing at California. The court concluded: "It is insufficient to meet the relatedness prong for Plaintiffs to show that CITGO sold its products into the California market and that Plaintiffs claim to have been injured by those products. . . . Plaintiffs' evidence here is devoid of any jurisdictional facts regarding any actual

alleged deception, which Plaintiffs acknowledge is 'the tortious conduct at the heart of Plaintiffs' suits.' "

As to the remaining defendants, the court denied the joint motion to quash on the basis that plaintiffs' claims arise out of or are related to defendants' "extensive contacts with California, including their sale and promotion of fossil fuel products in California, their allegedly deceptive statements regarding climate change, and the alleged injuries Plaintiffs suffered in California."

DISCUSSION

Plaintiffs contend the trial court erred in concluding their claims did not arise from or relate to Citgo's California contacts. We agree, as explained below.

## I. Relevant Law

Courts may exercise either general or specific personal jurisdiction over a defendant. (*SK Trading Internat. Co., Ltd. v. Superior Court* (2022) 77 Cal.App.5th 378, 386 (*SK Trading*); *Ford Motor*, *supra*, 592 U.S. at p. 358.)

Only specific jurisdiction is at issue here. For specific jurisdiction, a suit must " '*relate to* the defendant's contacts with the forum.' " (*Ford Motor*, *supra*, 592 U.S. at p. 362.) "[A] strict causal relationship between the defendant's in-state activity and the litigation" is not needed for specific personal jurisdiction, and "some relationships will support jurisdiction without a causal showing." (*Ibid.*)

A court may exercise specific jurisdiction over a foreign defendant—i.e., one domiciled outside the jurisdiction such as Citgo—provided: (1) the defendant "take[s] 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State' "; (2) the plaintiff's claims arise out of or relate to the defendant's contacts with the forum; and

6

(3) maintenance of the suit is " 'reasonable,' " such that it " 'does not offend traditional notions of fair play and substantial justice.' " (*Ford Motor*, *supra*, 592 U.S. at pp. 359, 358.)  The plaintiff must satisfy the first two prongs of the test; if the plaintiff does so, the burden shifts to the defendant to make a " ' "compelling case" ' " that the exercise of jurisdiction would be unreasonable.  (*Axiom Foods, Inc. v. Acerchem Int'l, Inc.* (9th Cir. 2017) 874 F.3d 1064, 1068–1069; *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 477.)

Because our resolution of the personal jurisdiction question in this case is based on undisputed evidence, we review this matter de novo.  (*SK Trading*, *supra*, 77 Cal.App.5th at p. 387.)

## II.  Specific Jurisdiction

Citgo concedes the first prong—purposeful availment.  Accordingly, we focus our analysis on the second and third prongs.

### A.  Plaintiffs' Claims Relate to Citgo's California Contacts

Plaintiffs must demonstrate, through pleadings or declarations, that Citgo committed intentional acts expressly aimed at the forum state that give rise or relate to their claims.  (*Schwarzenegger v. Fred Martin Motor Co.* (9th Cir. 2004) 374 F.3d 797, 805–806; *Dole Food Co. v. Watts* (9th Cir. 2002) 303 F.3d 1104, 1111.)  "In determining 'express aiming,' the relevant inquiry is 'whether the defendant's conduct connects him to the forum in a meaningful way.' " (*Yeager v. Airbus Group SE* (C.D.Cal. Jan. 26, 2021, No. 8:19-cv-01793-JLS-ADS) 2021 WL 750836, at *4, quoting *Walden v. Fiore* (2014) 571 U.S. 277, 290.)

As we explain below, plaintiffs have satisfied the second prong by demonstrating Citgo purchased, distributed, and sold fossil fuel products to California consumers via its contractual arrangements with Sears, Roebuck

7

and Co. (Sears), 7-Eleven, Inc. (7-Eleven), and franchisees under Jack in the Box Inc. (Jack in the Box), promoted the sold products as Citgo gasoline, and did not include any materials identifying climate-related risks associated with utilizing gasoline.  Because the complaint clearly encompasses claims based upon a duty to warn and asserts that Citgo failed to do so, plaintiffs have met their burden.

**1. Citgo Was Directly Involved in Distributing Fossil Fuel Products to California Consumers**

Plaintiffs allege—and the record demonstrates—Citgo was "engaged in the refining, marketing, and transportation of petroleum products including gasoline . . . ."  In California, and elsewhere, Citgo sold "significant volumes of fossil-fuel derived consumer motor oils and automobile lubricants through retail and wholesale distributors."

Citgo denies refining gasoline in California or shipping refined gasoline to California.  But Citgo acknowledges that, between 1983 and 2007, it supplied gasoline "from California refiners/suppliers . . . to certain retail stations in California owned by Sears, 7-Eleven, and Jack in the Box."  And the record includes lease/distribution agreements between Citgo and Sears, 7-Eleven, and Jack in the Box, which resulted in Citgo: (1) operating 22 retail gas stations at Sears locations in 1983 and 1984, (2) supplying gasoline to 305 7-Eleven retail locations in California between 1986 and 2002, and (3) supplying gasoline to approximately three to five Jack in the Box retail locations in California between 2002 and 2007.

The terms of those lease/distribution agreements highlight the detail of Citgo's involvement with the eventual sale of gasoline.  For example, the Sears agreement leased premises to Citgo for the "retail sale of motor fuels and approved merchandise," required Citgo to provide employees to operate

8

the retail sales, and allowed Citgo to "advertise and promote" gasoline sales "as [Citgo] determines is appropriate." The 7-Eleven agreement provided that The Southland Corporation (7-Eleven's parent company) would purchase "motor fuels" from Citgo for retail sale, and Citgo would "make expenditures of $6,500,000 in the aggregate with respect to expenditures requested . . . by Southland, to enhance the CITGO brand with respect to any of the Retail Sites using the CITGO Marks and Trade Names." Likewise, Citgo's distributor agreement with Jack in the Box recited that Citgo would provide gasoline to certain Jack in the Box franchises. As part of that arrangement, Citgo expressly granted to the franchisees "the right to use CITGO's applicable brand names, trademarks and other forms of CITGO's identification, in the manner established by CITGO from time to time, in connection with the resale by Franchisee of products acquired under CITGO's brand names." Citgo also reserved the right to control the quality and branding of the products sold/distributed under its name. These retail locations were "CITGO-branded" based on "[p]oint of [p]urchase branding material" provided by Citgo to those locations. The branding material consisted of the Citgo Tristar logo and a slogan, which was placed either at the gas station pump or inside the gas station.

Citgo also contracted with California suppliers and trucking companies to supply gasoline pursuant to these lease/distribution agreements. For example, one purchase contract with Tower Energy Group—a California corporation—recited that Citgo "sells Products in the state[ ] of California," and "products" was defined as "regular, unleaded regular, intermediate unleaded, premium unleaded and diesel fuel." In that agreement, Citgo agreed to purchase between 16 million and 22 million gallons of product per month.

9

While Citgo contends its branding at the retail locations does not amount to marketing of the gasoline, we disagree. Courts have regularly noted that branding and trademarks constitute forms of advertising. For example, in *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group* (1996) 50 Cal.App.4th 548, 557, the Second District Court of Appeal explained, " 'A trademark serves three distinct and separate purposes: (1) It identifies a product's origin, (2) it guarantees the product's unchanged quality, and (3) *it advertises the product.*' " (Accord, *Brady v. Bayer Corp.* (2018) 26 Cal.App.5th 1156, 1174 [average consumer "would rely upon the representation of a known brand with 70 years of goodwill and credibility behind it"].) Here, Citgo's distribution arrangements required 7-Eleven and Jack in the Box to utilize Citgo's branding materials in connection with the sale of gasoline at those retail locations. And it imposed controls on how 7-Eleven and Jack in the Box could use its branding materials. By using its logo and point of purchase branding materials, Citgo "advertise[d] the product" by associating the gasoline with its brand, including consumer knowledge and sentiment related to Citgo's brand, to promote the gasoline's sale to consumers. The record for purposes of the motion to quash is unambiguous that no warnings regarding the risk of fossil fuel usage were included in those branding materials.

In sum, the evidence is copious that Citgo was intricately involved in the distribution of fossil fuel products under its brand to California consumers and failed to provide any warnings regarding the climate-related risks associated with the use of those products.

## 2. Citgo's Failure to Warn Provides a Valid Basis for Plaintiffs' Claims

Plaintiffs' complaints assert various causes of action based on *both* affirmative misrepresentations and omissions. For example, the causes of action for strict liability for failure to warn and negligence focus on Citgo's alleged duty to warn and exercise reasonable care in selling and labeling fossil fuel products, and include the following allegations: (1) Citgo "had a duty to warn consumers . . . of reasonably foreseeable environmental and health risks" posed by fossil fuels; (2) Citgo "had a duty . . . to exercise reasonable care in the marketing, promoting, sale, and/or labeling of [its] fossil fuel products"; (3) Citgo had a duty to exercise reasonable care "includ[ing] when [it] advertised, promoted, and/or sold fossil fuel products"; and (4) Citgo "had a duty to warn consumers . . . of reasonably foreseeable environmental and health risks posed by those products." Likewise, the causes of action for nuisance and trespass—while certainly discussing affirmative wrongful promotion of fossil fuels—state the harm was created by defendants' "acts *and* omissions." (Italics added.)

When a plaintiff asserts a product liability case based on failure to warn, the plaintiff must prove " '(1) the manufacturer knew, or should have known of the risk inherent in the product; (2) there were no warnings or instructions, or those provided were inadequate; (3) the absence of warnings made the product inherently dangerous; (4) the absence of adequate warnings or instructions was the proximate cause of plaintiff's injury.' " (*Cruz-Vargas v. R.J. Reynolds Tobacco Co.* (1st Cir. 2003) 348 F.3d 271, 276.) The duty to warn applies to "all entities in a product's chain of distribution" regardless of a defendant's position in that chain so long as the defendant has marketed or distributed a defective product that caused injury. (*Webb v. Special Electric*

11

*Co., Inc.* (2016) 63 Cal.4th 167, 181; *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 348.)

Asbestos cases provide a useful analogy in assessing when a duty to warn arises for entities involved in the chain of distribution for inherently dangerous products. For example, in *Bettencourt v. Hennessy Industries, Inc.* (2012) 205 Cal.App.4th 1103, the defendant manufactured and distributed grinding machines, the sole purpose of which was to grind asbestos-containing brake linings, which resulted in releasing asbestos fibers. (*Id.* at p. 1117.) While the machines themselves did not contain asbestos, the court noted the sole purpose of those machines was for " 'the very activity that created a hazardous situation.' " (*Ibid.*, italics omitted.) The court thus rejected the defendant's argument that it was "outside the chain of distribution." (*Id.* at p. 1121.) Another example arose in *Webb v. Special Electric Co., Inc.*, *supra*, 63 Cal.4th 167, in which the plaintiff was injured by exposure to asbestos products and sued a raw asbestos supplier for failing to warn him about the danger. (*Id.* at p. 176.) In that case, the California Supreme Court clarified "[t]he duty to warn applies to all entities in a product's chain of distribution," including a raw material supplier. (*Id.* at p. 181.) Accordingly, Citgo did not need to be the refiner or producer of the fossil fuel products to be subject to liability. These cases demonstrate the broad approach adopted by courts in imposing a duty to warn on a range of entities within the chain of distribution.

Similarly, courts do not require a defendant to be the direct seller of the product for liability to attach. In *Bader v. Avon Products, Inc.* (2020) 55 Cal.App.5th 186, for example, the plaintiff purchased Avon-labeled products through "a direct sales model with nonemployee sales representatives." (*Id.* at pp. 199–200.) As the court explained, "Avon used sales representatives to

12

market and sell the products at issue directly to [individuals] in California. This evidence establishes a sufficient ' "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." ' " (*Id*. at p. 200.)  The court reasoned: " '[I]f the sale of a product of a manufacturer . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer . . . to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.' " (*Id*. at p. 197, italics omitted.)  Thus, liability may exist even though Citgo was not (in certain circumstances) the direct seller of the fossil fuels.

We find plaintiffs' claims fall directly within the scope of product liability law based on failure to warn.  Citgo's role in the chain of distribution of fossil fuels is much more direct than the defendants in either *Bettencourt* or *Webb*.  The record demonstrates that Citgo participated in the chain of distribution by, for example, purchasing gasoline, arranging transport, entering into various distribution agreements for its sale to California consumers through Citgo's commercial partners, and arranging for that gasoline to be sold under its brand.  And Citgo does not appear to dispute, at least for purposes of this motion, that it (1) was aware of the climate-related risks associated with fossil fuel products, and (2) did not provide any warnings related to those risks.

Citgo's participation in the distribution of fossil fuel products in California, combined with its alleged knowledge of the risks associated with fossil fuels and the undisputed lack of any warning to consumers regarding

13

those risks, satisfy the "related to" factor. Nothing more is needed.[6] (See *Taylor v. Elliott Turbomachinery Co. Inc.* (2009) 171 Cal.App.4th 564, 575 ["California's products liability doctrine 'provides generally that manufacturers, retailers, and others in the marketing chain of a product are strictly liable in tort for personal injuries caused by a defective product.' "]; *Groll v. Shell Oil Co.* (1983) 148 Cal.App.3d 444, 448 ["California courts have held that a product, though faultlessly made, may nevertheless be deemed defective within the general strict liability rule if it is unreasonably dangerous to place the product in the hands of the user without adequate warnings."].)

### 3. Plaintiffs' Claims Do Not Require Evidence of Affirmative Misrepresentations

Based upon a strangled reading of the complaint, Citgo asserts the lack of evidence of *affirmative misrepresentations* by Citgo prohibits the exercise of personal jurisdiction. Specifically, Citgo contends that plaintiffs' complaint does not generally challenge its sale of gasoline; rather, it asserts plaintiffs' claims arise from its alleged misrepresentations and deceptive promotion, resulting in higher gasoline sales than otherwise would have occurred if consumers had been warned about the climate-related risks of using fossil fuels. Based on this contention, Citgo asserts plaintiffs were required to produce evidence of affirmative misrepresentations in marketing directed at California to connect their claims to Citgo's California contacts.

---

[6] Citgo argues plaintiffs' decision to not sue certain other manufacturers or retailers evidences that the case "turned on the type of affirmative deceptive conduct alleged in the complaints, not on mere silence." But plaintiffs' decision regarding which entities to sue as defendants does not alter our legal analysis.

However, the complaint is not so narrow. As discussed above, the complaint clearly asserts claims based upon a duty to warn and Citgo's failure to do so, and plaintiffs produced evidence to support those claims. Plaintiffs' opposition to Citgo's motion to quash also repeatedly emphasizes this failure to warn theory. (See *Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1065 ["Numerous cases have recognized that a product may be defective because of the absence of a warning that was necessary to allow its safe use."].) We therefore reject Citgo's contention.

Citgo next asserts that, if it were subject to specific personal jurisdiction based on a failure to warn, this court should still affirm the order as to the nuisance and trespass claims because they "cannot turn solely on failure to warn."

Citgo is correct that "[w]hen a plaintiff relies on specific jurisdiction, he must establish that jurisdiction is proper for 'each claim asserted against a defendant.'" (*Picot v. Weston* (9th Cir. 2015) 780 F.3d 1206, 1211, quoting *Action Embroidery Corp. v. Atl. Embroidery, Inc.* (9th Cir. 2004) 368 F.3d 1174, 1180.) However, Citgo's forum contacts are sufficient to impose specific jurisdiction over these claims. As discussed above, a defendant's forum contacts do not need to have *given rise* to the plaintiff's claims. (*Ford Motor*, *supra*, 592 U.S. at pp. 361–362.) Instead, courts must focus on a company's connections to the state, and whether those connections relate to the claims. (*Id.* at p. 367.) In *Ford Motor*, for example, specific jurisdiction existed over the product liability claim even though the vehicles were not designed, manufactured, or sold in Montana. (*Id.* at p. 363.) This was because "Ford's in-state activities [were] designed to make driving a Ford convenient there: that Ford dealers stand ready to service the car; that other auto shops have ample supplies of Ford parts; and that Ford fosters an active resale market

15

for its old models." (*Id.* at p. 367.) None of these contacts related to the product liability claim, yet the Supreme Court found them sufficient to give rise to specific jurisdiction because the focus was on Ford's connections to the state. (*Ibid.*) Here too, Citgo's contacts with California—distributing gasoline—are sufficient to give rise to specific jurisdiction over the nuisance and trespass claims.

Moreover, even if we were to accept Citgo's position, extending jurisdiction would be appropriate in this situation. "When a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts. We believe that judicial economy, avoidance of piecemeal litigation, and overall convenience of the parties is best served by adopting this doctrine." (*Action Embroidery Corp.*, at p. 1181.) While *Action Embroidery* discussed pendent personal jurisdiction, which is a federal doctrine with no application to our state issues, the underlying policy of encouraging judicial economy, avoiding piecemeal litigation, and encouraging convenience of the parties applies here with equal force. (See *City and County of Honolulu v. Sunoco LP* (2023) 153 Hawai'i 326, 342 ["courts 'need not assess contacts on a claim-by-claim basis if all claims arise from the same forum contacts.' "].) Accordingly, we find judicial efficiency supports resolution of all claims raised by plaintiffs against Citgo in the pending matter.

### 4. Conclusion

At the jurisdictional stage, plaintiffs do not need to prove the merits of their case—i.e., they need not demonstrate that Citgo's acts or omissions resulted in increased fossil fuel sales to the detriment of California residents. (*SK Trading, supra*, 77 Cal.App.5th at p. 390.) Rather, plaintiffs must

16

demonstrate Citgo "served a market" for the very product that plaintiffs allege is harmful and caused injury in California based on that product, and they must show a relationship among the defendant, the forum, and the litigation. (*Ford Motor*, *supra*, 592 U.S. at p. 365.) Plaintiffs here have done so. Citgo unquestionably participated in the retail gasoline market, plaintiffs have identified climate-related harm in California allegedly arising from the use of fossil fuels, including gasoline, and plaintiffs' claims relate to the lack of warnings provided by Citgo in connection with those gasoline sales. Specific jurisdiction over Citgo in this matter is thus appropriate.

## B. Imposing Jurisdiction Is Fair and Reasonable

The remaining issue is whether the assertion of personal jurisdiction over Citgo would comport with notions of "fair play and substantial justice."

Citgo bears the burden of presenting a " ' "compelling case" ' " that the exercise of jurisdiction would be unreasonable. (*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, *supra*, 874 F.3d at pp. 1068–1069.) In making this determination, courts consider the following factors: the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. (*Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1070.)

Citgo argues exercising jurisdiction would be unreasonable because: (1) it would be forced to submit to "the coercive power of a state with little interest" over its conduct; (2) California does not have a more significant interest than other states; (3) Citgo did not refine or sell its own gasoline in California; and (4) plaintiffs' goal of curbing fossil fuel use or allocating the

17

cost of climate change is "not shared among the 'several States,' much less the federal government." Citgo's arguments are not persuasive.

California has more than a "little interest" over Citgo's conduct. Although it did not refine gasoline in California, the evidence demonstrates Citgo purchased, distributed, and sold gasoline under its brand within California for approximately 30 years. Moreover, the fairness and reasonableness of a California forum is strengthened by California's significant interests at stake in this litigation—providing residents with a convenient forum for redressing discrete California-specific harms that have occurred or are anticipated to occur. (*Ford Motor*, *supra*, 592 U.S. at p. 368.) Plaintiffs have identified specific climate-related harms arising in California, including "[e]xtreme flooding events," a substantial rise in sea level "along California's coast and in the San Francisco Bay Area" that jeopardizes civil infrastructure, and "increased risk of extreme wildfire," drought, and landslides. Plaintiffs also note they have had to spend significant funds, and will continue to need significant financial investment, to study and mitigate the effects of global warming in California. These impacts are California-specific harms that California has a greater interest in addressing than other states. The alleged lack of interest by other states or the federal government in curbing climate-impacts of fossil fuel usage in California does not negate California's interest or authority to do so.

Permitting jurisdiction over Citgo based on its distribution of fossil fuel products in California also furthers the purpose of California's strict liability and negligence laws. As courts have long recognized, "public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." (*Escola v. Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 462 (conc.

18

opn. of Traynor, J.).) " 'The purpose of [strict] liability is to insure [*sic*] that the costs of injuries resulting from defective products are borne by the manufacturers [and distributors] that put such products on the market rather than by the injured persons who are powerless to protect themselves.' " (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 994; see also *Impossible Foods Inc. v. Impossible X LLC* (9th Cir. 2023) 80 F.4th 1079, 1090 ["[I]t is hardly novel to say that a company that operated from California for years availed itself of that state's privileges and directed its activities there."].) As articulated in *Ford Motor*, "when a corporation has 'continuously and deliberately exploited [a State's] market, it must reasonably anticipate being haled into [that State's] court[s]' to defend actions 'based on' products causing injury there." (*Ford Motor*, *supra*, 592 U.S. at p. 364.)

Accordingly, Citgo had sufficient notice it would be subject to suit in California, and it has not demonstrated that exerting such jurisdiction is unreasonable.

## DISPOSITION

The order granting the motion to quash summons for lack of personal jurisdiction is reversed. The matter is remanded with directions to enter a new order denying the motion. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

PETROU, J.

WE CONCUR:

TUCHER, P. J.

RODRÍGUEZ, J.

A172719 / *Fuel Industry Climate Cases*

Trial Court: City and County of San Francisco Superior Court

Trial Judge: Hon. Ethan P. Schulman

Counsel:

Sher Edling, Victor M. Sher, Matthew K. Edling, Katie Jones, Miranda C. Holeton, and E. Grace Koster for Plaintiffs and Appellants.

John D. Nibbelin, County Counsel, David A. Silberman, Assistant County Counsel, Brian E. Kulich, Chief Deputy County Counsel, and Lauren F. Carroll, Deputy County Counsel, for Plaintiff and Appellant County of San Mateo.

Brian E. Washington, County Counsel, and Carolyn Tsai, Deputy County Counsel, for Plaintiff and Appellant County of Marin.

McDougal, Boehmer, Foley, Lyon, Mitchell & Erickson, Jennifer Lyon and Steven E. Boehmer, City Attorney, for Plaintiff and Appellant City of Imperial Beach.

Atchison, Barisone & Condotti, Anthony P. Condotti, City Attorney, for Plaintiff and Appellant City of Santa Cruz.

Jason M. Heath, County Counsel, for Plaintiff and Appellant County of Santa Cruz.

Dave Aleshire, City Attorney, Shannon Moore, Chief Assistant City Attorney, and Kimberly Chin, Senior Assistant City Attorney, for Plaintiff and Appellant City of Richmond.

Eimer Stahl, Nathan P. Eimer, Robert E. Dunn, and Collin J. Vierra for Defendant and Respondent.